FILED
COURT OF APPEALS DI
STATE OF WASHINGTO

2013 AUG 26 AM 9: 36



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68709-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER M. SMITH, SR., | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: August 26, 2013 |
| | ) | |

Cox, J. — A Terry stop requires a well-founded suspicion that the defendant has committed or is about to commit a crime.[1] The State has the burden to show by clear and convincing evidence that under the totality of the circumstances, a Terry investigatory stop is justified.[2] And a defense of necessity instruction requires sufficient evidence to support that defense.[3]

Here, the State established that the investigatory stop of Christopher Smith by a sheriff's deputy was proper. He does not challenge the search incident to his subsequent arrest. And Smith fails to show that there was

---

[1] State v. Doughty, 170 Wn.2d 57, 62, 239 P.3d 573 (2010) (citing Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

[2] Id.; State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).

[3] See State v. Jeffrey 77 Wn. App. 222, 224-25, 889 P.2d 956 (1995) (noting that a defendant may only obtain a defense of necessity instruction if he can prove four factors by a preponderance of the evidence).

sufficient evidence to support his requested instruction of necessity to the charge of unlawful possession of a firearm. We affirm.

King County Sheriff's Deputy Benjamin Callahan observed Smith riding his bike without a helmet while the deputy was patrolling an area in the city of Shoreline. The deputy was aware of recent reports of car prowling in a nearby area. As Smith rode along the sidewalk, he peered into the windows of the cars parked along the street. Deputy Callahan testified at the suppression hearing that after Smith passed him on his bike, he turned his car around to follow Smith. He did so both to conduct an investigatory stop based on Smith's conduct and because of his failure to wear a bike helmet. Deputy Callahan attempted to talk to Smith, who ignored him. The deputy then turned on his patrol car's lights and told Smith to "stop." Smith ignored this command and continued to bike toward his house. Deputy Callahan ran after Smith and physically seized him. In a search incident to arrest, the deputy discovered a gun in the fanny pack around Smith's waist. Following Miranda warnings, Smith admitted that he was not supposed to have a firearm because of his felony convictions. He claimed he needed the gun to protect his family.

The State charged Smith with first degree unlawful possession of a firearm. Smith moved to suppress evidence of the gun as well as his statements to the deputy on the basis that the investigatory stop was unconstitutional. The court disagreed, denying the motion. Thereafter, the court entered written findings of fact and conclusions of law, which incorporated his oral rulings denying the motion.

The State moved in limine to prevent Smith from arguing a defense of necessity at trial. Smith, in an offer of proof to the trial court, argued that his possession of the gun was necessary because of threats made to his son two weeks before the night in question. The trial court ruled that Smith had not shown by a preponderance of the evidence that he met any of the requirements to present a defense of necessity. Thus, it granted the State's motion.

Smith then waived his right to a jury trial and agreed to a trial on stipulated evidence. Based on this evidence, the court found Smith guilty of unlawful possession of a firearm.

Smith appeals.

## SUPPRESSION MOTION

Smith argues that the trial court erred in denying his motion to suppress the gun as evidence. We disagree.

### Terry Stop

Smith first argues that the trial court erred when it concluded that Deputy Callahan had a reasonable suspicion based on articulable facts to conduct an investigatory stop. We hold that the stop was valid.

Article I, section 7 of the Washington Constitution states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."[4] The Fourth Amendment to the United States Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects,

---

[4] WASH. CONST. art. I, § 7.

against unreasonable searches and seizures . . . ."[5] Thus, under both the Washington and federal constitutions, warrantless searches and seizures are presumptively unconstitutional, unless they fall within several narrow exceptions.[6] A Terry investigatory stop is such an exception.[7]

We review de novo whether a warrantless stop is constitutional.[8] Similarly, we review de novo whether the trial court's conclusions of law are supported by the findings of fact.[9] The trial court's findings of fact are reviewed for substantial evidence.[10] Unchallenged findings of fact are verities on appeal.[11]

Here, Smith does not challenge the trial court's findings of fact, and thus they are verities on appeal. Rather, he challenges the trial court's conclusions of law on the validity of the stop. We reject this argument.

As noted above, a Terry stop requires a well-founded suspicion that the defendant has committed or is about to commit a crime.[12] "The officers' actions must be justified at their inception."[13] "'[I]n justifying the particular intrusion the

---

[5] U.S. CONST. amend. IV.

[6] Doughty, 170 Wn.2d at 61.

[7] State v. Gatewood, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

[8] State v. Martinez, 135 Wn. App. 174, 179, 143 P.3d 855 (2006) (citing State v. Rankin, 151 Wn.2d 698, 694, 92 P.3d 202 (2004)).

[9] Id. (citing State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)).

[10] Id. (citing State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994)).

[11] State v. Luther, 157 Wn.2d 63, 78, 134 P.3d 205 (2006).

[12] Doughty, 170 Wn.2d at 62 (citing Terry, 392 U.S. at 21).

[13] Gatewood, 163 Wn.2d at 539.

police officer must be able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion.'"[14] The State has the burden to show by clear and convincing evidence that under the totality of the circumstances, the Terry stop was justified.[15]

In Terry v. Ohio,[16] the United States Supreme Court determined that an officer can detain a suspect for an investigatory stop without probable cause if the officer has a well-founded suspicion that criminal activity is taking place.[17] In Terry, a detective noticed Terry and another man standing on a street corner.[18]

> [The detective] saw one of the men leave the other one and walk southwest . . . past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the corner, pausing once again to look in the same store window. He rejoined his companion at the corner, and the two conferred briefly. . . . The two men repeated this ritual alternatively between five and six times apiece—in all, roughly a dozen trips.[19]

The United States Supreme Court held that the actions of Terry and the other man constituted facts sufficient to substantiate the deputy's articulable suspicion, justifying the investigatory stop.[20]

---

[14] Doughty, 170 Wn.2d at 62 (alteration in original) (quoting Terry, 392 U.S. at 21).

[15] Id.; Glover, 116 Wn.2d at 514.

[16] 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[17] Id. at 27.

[18] Id. at 5.

[19] Id. at 5-6.

[20] Id. at 27-28.

Given the totality of the circumstances here, Deputy Callahan had a reasonable and articulable suspicion that Smith had committed or was going to commit a crime: car prowling. It was an undisputed fact that Deputy Callahan knew of a rash of recent car prowl reports near the area where he encountered Smith riding his bike. The trial court also found that Smith "rode along the sidewalk . . . peering into windows of cars parked along the street."[21] The trial court concluded that Smith's "action of peering into cars as he rode along was a reasonable basis to conclude this was consistent with car prowling."[22] We agree.

Smith relies on state authority reaching contrary results. The cases on which he relies are distinguishable.

In State v. Doughty, the supreme court held that the accused's actions did not support a Terry stop.[23] There, a police officer observed Doughty at 3:20 a.m., "park his car, approach a house, return to his car less than two minutes later, and drive away."[24] The officer did not see either what Doughty did at the house or with whom he interacted.[25] But the officer was concerned because neighbors had reported "'large quantities of short stay traffic' at the house,

---

[21] Clerk's Papers at 91.

[22] Id.

[23] 170 Wn.2d 57, 60, 239 P.3d 573 (2010).

[24] Id.

[25] Id.

prompting police to identify it as a 'drug house.'"[26] The officer consequently stopped Doughty based on suspicion of drug activity.[27]

The State argued that Doughty was not unconstitutionally stopped. It pointed to (1) law enforcement's identification of the house where Doughty stopped as a drug house; (2) the previous complaints received by police from neighbors about the house; (3) Doughty's visit to the house at 3:20 a.m.; and (4) the fact that this visit lasted less than two minutes.[28]

The supreme court held that these facts were insufficient for a stop, given the totality of the circumstances.[29] Doughty's presence "in a high-crime area at a 'late hour'" [did] not, by itself, give rise to a reasonable suspicion" that justified detaining him.[30] The court viewed the stop as one based on Doughty's visiting a location—even a suspected drug house --- at 3:20 a.m. for only a few minutes.[31] That was not enough for a valid stop.

Similarly, in State v. Martinez, Division Three of this court held that the mere fact that Martinez was walking at 12:46 a.m. in a "high crime" area where vehicle prowls had been reported did not justify a Terry stop.[32] "The problem here is not with the officer's suspicion; the problem is with the absence of a

---

[26] Id.

[27] Id.

[28] Id. at 62-63.

[29] Id. at 63.

[30] Id. at 62.

[31] Id. at 63.

[32] 135 Wn. App. 174, 177-78, 181-82, 143 P.3d 855 (2006).

7

*particularized* suspicion."[33] Thus, "there must be some suspicion of a particular crime or a particular person, and some connection between the two" to warrant a Terry stop.[34]

As demonstrated by Doughty and Martinez, any one of the unchallenged facts supporting the stop in this case, by itself, would not have provided a constitutional basis for Smith's stop.[35] If, as in Martinez, Deputy Callahan had only observed Smith riding his bike down the street in an area where car prowls had been reported, that fact alone would not have been sufficient to justify a Terry stop.[36] But Deputy Callahan also observed Smith peering into cars as he rode down the sidewalk. Together with the other facts, including the deputy's knowledge of recent car prowls in a nearby area, there was sufficient information to justify Deputy Callahan's investigatory stop of Smith. Thus, the trial court did not err when it concluded that:

> Deputy Callahan had a reasonable suspicion, based on articulable facts, to detain the defendant to investigate his action of peering into cars as he rode along the street. The deputy's attempt to stop the defendant to investigate was a reasonable 'Terry' stop, given the defendant's actions and the information the officer knew about recent car prowls in the area.[37]

---

[33] Id. at 181-82 (some emphasis added) (citing State v. Duncan, 146 Wn.2d 166, 179, 43 P.3d 513 (2002); State v. Kennedy, 107 Wn.2d 1, 6, 726 P.2d 445 (1986)).

[34] Id. at 182.

[35] See e.g., Martinez, 135 Wn. App. at 179-80; Doughty, 170 Wn.2d at 62.

[36] See Martinez, 135 Wn. App. at 179-80.

[37] Clerk's Papers at 91-92.

8

Smith contends that the fact that he appeared to be looking into parked cars "is innocuous." He states that:

> Bicycle riders are wise to be aware of any nearby motor vehicles in order to protect themselves. This is even true of parked cars . . . . The best way to prevent being "doored" is "a continued eye scanning and seeking on the part of the biker to see if there are people in the upcoming parked cars, and to give enough room in case a door does swing open to avoid getting clipped."[38]

But even "innocuous" behavior may provide the basis for an investigatory stop.[39] Thus, though looking in car windows while riding a bike could be an effort to avoid being "doored," it may also be consistent with car prowling, as the trial court determined. This was a valid investigatory stop on the basis the trial court decided.

Because this investigatory stop was valid on the basis we just discussed, there is no need to consider whether the stop was also valid on the basis that Smith was allegedly violating a King County ordinance for not wearing a bicycle helmet.

Smith does not challenge the search incident to his subsequent arrest. Because the stop was valid, we need not discuss this aspect of this case.

*Pretextual Investigation*

Smith next argues that the Terry stop was unconstitutional because the alleged civil infraction of riding without a helmet was a pretext to investigate

---

[38] Brief of Appellant at 11-12 (quoting http://www.colbachlaw.com/portland_bicycle_lawyers.html (last viewed 12/3/12)).

[39] Kennedy, 107 Wn.2d at 6.

unrelated alleged criminal activity. We hold that there was no pretextual stop here.

We discussed earlier in this opinion why the seizure of Smith was a valid Terry stop based on the deputy's suspicion that Smith was car prowling. Smith's claim of pretext does nothing to diminish that conclusion.

Relying primarily on State v. Ladson[40] and its progeny, Smith argues that the stop was pretextual. We disagree.

This court reviews de novo conclusions of law, such as whether a stop is pretextual.[41]

As the supreme court explained in Ladson, a pretextual stop occurs when:

> the police [pull] over a citizen, not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving. Therefore the reasonable articulable suspicion that a traffic infraction has occurred which justifies an exception to the warrant requirement for an ordinary traffic stop does not justify a stop for criminal investigation.[42]

Under Ladson, a court determines whether a stop is pretextual by considering the totality of the circumstances.[43] In doing so, the court must consider "both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior."[44]

---

[40] 138 Wn.2d 343, 979 P.2d 833 (1999).

[41] State v. Arreola, 176 Wn.2d 284, 291, 290 P.3d 983 (2012).

[42] Ladson, 138 Wn.2d at 349.

[43] Id. at 358-59.

[44] Id.

Here, the trial court made an oral ruling on the claim of pretext. In its ruling, the court appears to have decided that both the objective and subjective elements of this test supported the validity of the stop.[45] And the trial court's written findings and conclusions expressly incorporated the court's oral rulings. In reviewing this record, we conclude that Ladson does not control.

Moreover, the supreme court's most recent opinion on pretextual stops, State v. Arreola,[46] further supports the validity of this investigatory stop. In Arreola, the supreme court held that a traffic stop motivated primarily by an uncorroborated tip "is not pretextual so long as the desire to address a suspected traffic infraction (or criminal activity) for which the officer has a reasonable articulable suspicion is an actual, conscious, and independent cause of the traffic stop."[47] In Arreola, Officer Valdivia's primary motivation in pulling the defendant's car over was to investigate a reported DUI.[48] But, because his secondary motivation, the car's altered exhaust in violation of RCW 46.37.390, was an actual reason to stop the defendant, the stop was not pretextual.[49]

In this case, a valid reason for the stop existed: suspected car prowling. Even if we assume Smith's alleged violation of the King County ordinace played

---

[45] Report of Proceedings at 149-151.

[46] 176 Wn.2d 284, 290 P.3d 983 (2012).

[47] Id. at 288.

[48] Id. at 289.

[49] Id. at 299-300.

a role in the decision to stop Smith, it makes no difference to the validity of the stop. An independent basis for the stop existed. There was no pretext.

Smith argues that "'it is not enough for the State to show there was a traffic violation. The question is whether the traffic violation was the real reason for the stop.'"[50] Smith quotes State v. Montes-Malindas,[51] a Division Three opinion. But in view of the supreme court's holding in Arreola, this case does not control here.

The Montes-Malindas court, in holding that a stop was pretextual and unconstitutional, stated that "[t]o satisfy an exception to the warrant requirement, the State must show that the officer, both subjectively and objectively, is actually motivated by a perceived need to make a community caretaking stop aimed at enforcing the traffic code."[52] This is no longer the law after the supreme court's holding in Arreola. In sum, this stop was valid.[53]

## DEFENSE OF NECESSITY INSTRUCTION

Smith argues that the trial court erred when it ruled that he was not entitled to an instruction on the defense of necessity. We disagree.

---

[50] Brief of Appellant at 19 (quoting State v. Montes-Malindas, 144 Wn. App. 254, 261, 182 P.3d 999 (2008)).

[51] 144 Wn. App. 254, 182 P.3d 999 (2008).

[52] Id. at 260.

[53] See Arreola, 176 Wn.2d at 298-99.

A criminal defendant has a constitutional right to present a defense.[54] "A defendant raising an affirmative defense must offer sufficient admissible evidence to justify giving an instruction on the defense. In evaluating whether the evidence is sufficient to support such an instruction, the trial court must interpret the evidence most strongly in favor of the defendant."[55]

This court reviews de novo a claim of a denial of Sixth Amendment rights, including the denial of a defendant's right to present a defense.[56]

In State v. Jeffrey, Division Three of this court was the first Washington court to address whether necessity is an available defense for a violation of unlawful possession of a firearm.[57] It held that to obtain a defense of necessity instruction, a defendant must demonstrate that: (1) he "reasonably believed he or another was under unlawful and present threat of death or serious bodily injury;" (2) he "did not recklessly place himself in a situation where he would be forced to engage in criminal conduct;" (3) he "had no reasonable legal alternative;" and (4) "[t]here was a direct causal relationship between the criminal action and the avoidance of the threatened harm."[58]

_____

[54] Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006).

[55] State v. Otis, 151 Wn. App. 572, 578, 213 P.3d 613 (2009) (citing State v. Janes, 121 Wn.2d 220, 237, 850 P.2d 495 (1993); State v. May, 100 Wn. App. 478, 482, 997 P.2d 956 (2000)).

[56] State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

[57] 77 Wn. App. 222, 224, 889 P.2d 956 (1995).

[58] Id. at 224.

The Jeffrey court concluded that the defendant in that case was not entitled to an instruction on the defense of necessity.[59] Skip Jeffrey and his wife saw an individual directly outside their kitchen window and called the police.[60] The police arrived and searched the area, but, finding no one, left.[61] Jeffrey then called a friend who came over to the house and stayed for about an hour.[62] Before leaving, the friend left a handgun under the Jeffreys' couch.[63] The Jeffreys later heard noises outside the house and saw a figure outside the window.[64] Jeffrey fired the gun left by his friend through the headboard of the bed.[65] The Jeffreys then called the police again.[66] The police subsequently charged Jeffrey with unlawful possession of a firearm.[67]

Division Three concluded that the evidence presented did not support an instruction on the defense of necessity. "There was no verification of an individual actually lurking outside the house."[68] Nor was there "evidence he or she was capable of immediately entering the home or in any way posed a threat

---

[59] Id. at 227.

[60] Id. at 223.

[61] Id.

[62] Id.

[63] Id.

[64] Id.

[65] Id.

[66] Id.

[67] Id.

[68] Id. at 227.

of imminent serious bodily injury or death to the Jeffreys."[69] And, the Jeffreys had an adequate alternative to the possession of a gun, a phone call to the police.[70]

Here, Smith presents even less evidence to support a defense of necessity instruction than Jeffrey did.

The trial court's unchallenged findings of fact state that:

> Approximately two weeks prior to September 13, 2011, the defendant's son, Kenneth Smith . . . had gotten into an altercation at a park with another teenager. . . . When Kenneth refused to fight, the other teenager called his father. Kenneth could overhear the father say that he was going to come to the park with a gun.[71]

Kenneth then went home and told Smith what had happened at the park. "Approximately two weeks later . . . the defendant got into an argument with Kenneth. Kenneth left the house."[72] Thus, Smith argues, he reasonably believed his son "was under a present, unlawful threat of death or serious bodily injury."[73] But Smith cannot demonstrate that his son was under a *present* threat. Likewise, he cannot point to any evidence to substantiate the other three Jeffrey factors. Smith had a reasonable legal alternative to leaving his house. If he was truly concerned about his son, he could have called the police. And, as the court trial found, Smith "had owned the gun for at least a month prior to September

---

[69] Id.

[70] Id.

[71] Clerk's Papers at 94-95.

[72] Id. at 95.

[73] Brief of Appellant at 28.

15

13th."[74] Thus, based on this unchallenged finding of fact, Smith could not demonstrate that any violence he might have feared was imminent. There was no basis to support the giving of the instruction he requested.

In arguing that the trial court erred in its exclusion of evidence regarding a defense of necessity, Smith relies on United States v. Newcomb.[75] This case is not helpful because its facts are distinct from Smith's. Newcomb argued he only had possession of the gun at issue in the case because he had taken it and the ammunition from another individual.[76] He had done so, he argued, because he felt "an obligation to prevent [that individual's] imminent violence toward an unknown third party."[77] He was thus able to demonstrate a fear of imminent violence, which Smith is not able to do. Thus, Newcomb is not helpful.

We affirm the judgment and sentence.

Cox, J.

WE CONCUR:

---

[74] Clerk's Papers at 95.

[75] 6 F.3d 1129 (6th Cir. 1993).

[76] Id. at 1131.

[77] Id.