[No. 56951-7.   En Banc.   March 14, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. CONJEWEL MARCHE GLOVER, *Appellant.*

Julie A. Kesler, Scott G. Busby, Eric Broman, and Suzanne Elliott of Washington Appellate Defender Association, for appellant.

Norm Maleng, Prosecuting Attorney, Greg R. Hubbard, Assistant Chief Deputy, and Sabrina K. Housand, Deputy, for respondent.

Gregory E. Keller on behalf of the American Civil Liberties Union; Neil M. Fox on behalf of Seattle–King County Public Defender Association, amici curiae for appellant.

Dore, C.J.—While patrolling the grounds of Lakeshore Village Apartments, police officers observed appellant Glover leaving one of the apartment buildings. The officers stopped appellant Glover to investigate a possible criminal trespass. As the officers approached Glover, one of them observed a plastic baggie in his hand which he believed contained cocaine. The officers then asked Glover to open his hand. The trial judge in his oral opinion found that "[b]ased upon *experience, location, and conduct of the Respondent, the officer had a reasonably articulable suspicion that criminal conduct was going on; that he had a right to detain the Respondent long enough for further investigation, which included the justifiable demand that the Respondent open his a [sic] hand. . . ."* (Italics ours.) Report of Proceedings, at 34–35.

Glover was arrested and convicted of possession of cocaine. We agree with the trial court and hold that the officers had reasonable suspicion to conduct a *Terry* stop and that their investigation provided them with probable cause that a crime was being committed justifying their search of appellant. *Terry v. Ohio,* 392 U.S. 1, 16–19, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). We affirm.[1]

## FACTS

On May 6, 1989, Seattle police officers Michael Alphin and Alex Wiggins were engaged in a routine bicycle patrol of Lakeshore Village Apartments, a multiunit apartment complex occupying approximately one city block and housing more than 500 residents. Alphin testified that the apartments have a history of a high incidence of gang and drug activity. In order to reduce that activity and to deter traffic and the congregation of individuals on the property, the management surrounded the complex with a fence

---

[1]Originally, this case came before this court as part of a consolidation of four appeals. Due to the specific facts of the present case and the nature of the crime charged, we separated this case from the others for decision. The remaining cases were decided in *State v. Little,* 116 Wn.2d 488, 806 P.2d 749 (1991).

topped with concertina wire and posted several no trespassing or loitering signs throughout the property. Pursuant to an agreement between the management and the Seattle police, the police stop individuals observed on the apartment grounds who are not recognized as residents, and they investigate those individuals for criminal trespassing. If the individual stopped is found to be a nonresident, the police admonish the individual not to return to the property and ask the person to sign a card acknowledging the initial trespass and advising that the next time the person will be cited for criminal trespass if the individual returns. *See State v. Little,* 116 Wn.2d 488, 490, 806 P.2d 749 (1991).[2]

During their patrol of the complex, the officers observed Conjewel Glover coming out of one of the apartment buildings. Glover initially walked toward the officers but, upon seeing the police, he turned and walked in the opposite direction. The officers approached Glover because they felt that he was acting suspiciously. The suspicious behavior included Glover's turning away from the officers, walking faster, looking toward the officers and then looking away, and playing with his baseball cap by taking it off and twisting it around. Both officers stated that they were familiar with the residents of Lakeshore Village and that they did not recognize Glover as being a resident of the apartment. The officers testified regarding the trespass admonishment agreement between the police and the apartment management and stated that they stopped Glover to determine if he had a trespass admonishment card on file.

After stopping Glover, Wiggins asked him if he lived at Lakeshore Village and Glover responded, "Yes." Report of Proceedings, at 22. Shortly after Wiggins began questioning

---

[2]The record presented in the companion case, *State v. Little,* 116 Wn.2d 488, 806 P.2d 749 (1991), contains a more complete description of the physical layout of Lakeshore Village and the drug and gang activity occurring at the apartment complex. Those facts were before this court in the consolidated appeal and we incorporate them into this opinion.

Glover, Alphin noticed a clear plastic bag protruding from Glover's closed right hand. Alphin then grabbed Glover to prevent him from running away while Wiggins searched and handcuffed him. The Washington State Crime Laboratory analyzed the contents of the baggie and determined that it was cocaine.

On June 29, 1989, Glover was charged by information with possession of cocaine in violation of RCW 69.50-.401(d). Glover moved under CrR 3.6 to suppress the cocaine as evidence seized in an allegedly illegal search. At a juvenile court hearing before Judge Robert E. Dixon, the court denied Glover's motion to suppress and found him guilty. Glover appealed his conviction asserting that his initial stop violated the Fourth Amendment and article 1, section 7 of the state constitution and that the arresting officers exceeded the permissible scope of a *Terry* stop when they searched Glover without probable cause.

DIMENSIONS OF A *TERRY* STOP

■■ In the companion case, *State v. Little,* 116 Wn.2d 488, 495-96, 806 P.2d 749 (1991), we set forth the dimensions of a permissible investigatory stop under the Fourth Amendment and article 1, section 7. We noted that those constitutional provisions apply to all seizures of persons, including those encompassing only a brief detention short of traditional arrest. *Little,* 116 Wn.2d at 495. The Fourth Amendment and article 1, section 7 require that the seizure be reasonable. *Terry v. Ohio,* 392 U.S. 1, 16-19, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). A police officer can conduct an investigative or *Terry* stop based on less than probable cause to arrest. *Terry,* 392 U.S. at 25-26.

> When police officers have a "well-founded suspicion not amounting to probable cause" to arrest, they may nonetheless stop a suspected person, identify themselves, and ask that person for identification and an explanation of his or her activities.

*State v. White,* 97 Wn.2d 92, 105, 640 P.2d 1061 (1982) (quoting *State v. Gluck,* 83 Wn.2d 424, 426, 518 P.2d 703 (1974)); *Brown v. Texas,* 443 U.S. 47, 51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979).

■■ A *Terry* stop is justified if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21; *White,* 97 Wn.2d at 105. When reviewing the merits of an investigatory stop, a court must evaluate the totality of circumstances presented to the investigating officer. *United States v. Cortez,* 449 U.S. 411, 418, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981); *see Little,* 116 Wn.2d at 495. The court takes into account an officer's training and experience when determining the reasonableness of a *Terry* stop. *State v. Mercer,* 45 Wn. App. 769, 774, 727 P.2d 676 (1986); *State v. Samsel,* 39 Wn. App. 564, 570–71, 694 P.2d 670 (1985).

### OFFICERS CONDUCTED A LAWFUL *TERRY* STOP AND DID NOT EXCEED SCOPE OF STOP

Officers Alphin and Wiggins conducted a lawful *Terry* stop of Glover. The officers testified that they observed Glover exiting one of the apartment buildings and that upon seeing the police Glover began to act suspiciously. Further, the officers testified that they frequently patrolled the area, were familiar with the residents of the Lakeshore Village, and that they did not recognize Glover as an apartment resident. In viewing the totality of the circumstances presented to the investigating officers, we hold that the police, based upon *experience, location,* and the *conduct* of Glover, possessed sufficient reasonable suspicion to stop him to investigate him for criminal trespass. *See State v. Little,* 116 Wn.2d 488, 496, 806 P.2d 749 (1991).

■ The seizure of the cocaine in Glover's hand did not constitute an illegal search. The officers asked Glover if he lived at the apartments and he replied, "yes". The officers testified that, based on their familiarity with the residents of Lakeshore Village, they did not believe that Glover was telling the truth. In light of the officers' observations of Glover and their familiarity with the residents, the officers had probable cause to believe that a crime, criminal trespass, was being committed in their presence.

Before the officers could arrest Glover for criminal trespass, Alphin noticed plastic sticking out of Glover's closed fist. Wiggins testified that in that particular area plastic baggies are commonly used to transport narcotics. The officers had reasonable suspicion to believe that Glover was committing a second crime, possession of drugs. At the suppression hearing Judge Dixon made the following findings:

> The officers—at least the first officer, . . . observed what appeared to him to be a plastic bag in the hand of the Respondent. The area involved is an area of high drug traffic; that in the officer's experience plastic bags are the sort of container in which drugs are customarily found.
>
> The Respondent was asked if he resided there. He said did he [*sic*] and the officers did not believe that, based on their experience, which includes knowing just about everyone who lives in the housing area. The officers asked him what he had in his hand. The Respondent replied, "Nothing." The officer knew he had something in his hand and that the Respondent was being untruthful.
>
> Based upon *experience, location, and conduct of the Respondent, the officer had a reasonably articulable suspicion that criminal conduct was going on; that he had a right to detain the Respondent long enough for further investigation, which incl*̇*ded the justifiable demand that the Respondent open his a* [sic] *hand. . . .*
>
> The evidence was legally obtained. It's admitted into evidence, and the Respondent is guilty.

(Italics ours.) Report of Proceedings, at 34–35. We agree with Judge Dixon and find substantial evidence in the record to support the trial judge's findings and the conviction of Glover.

We affirm Glover's conviction for possession of a controlled substance.

CONCLUSION

The Lakeshore Village Apartments consists of approximately 15 separate buildings, and it is encompassed by a high fence topped with concertina wire. "No Trespassing or Loitering" signs are posted throughout the property, and an armed guard is posted at the entrance as the apartments have a history of high incidences of gang and drug activity.

The arresting officers had substantial evidence to justify a *Terry* stop, and they had reasonable grounds to believe that defendant was committing the crimes of criminal trespass and drug possession. His arrest, search, and conviction were justified.

We affirm.

DOLLIVER and DURHAM, JJ., and CALLOW, J. Pro Tem., concur.

GUY, J. (concurring)—For the reasons stated in my concurrence in *State v. Little,* 116 Wn.2d 488, 806 P.2d 749 (1991), I concur in the majority's holding that a lawful stop was made in this case on reasonable suspicion of criminal trespass. I cannot agree with the majority that the trial court was correct in ruling that the investigatory stop "included the justifiable demand" that the appellant open his hand. Majority opinion, at 511.

The search of Glover's closed fist was made during the period the appellant was stopped and prior to his formal arrest. The demand to search the appellant's hand could not have been lawfully made as part of a *Terry* patdown, which should involve a possible weapon as the object of the search. Rather, the command made by the officer that Glover open his hand followed the officers' noticing a clear plastic bag protruding from Glover's closed right hand. Apparently neither the trial court nor the majority has concluded, however, that the officers possessed probable cause to arrest the appellant for narcotics possession at this point. The majority states at page 515 that the officers had only a "reasonable suspicion" that the appellant was in possession of narcotics. Nevertheless, if the officers' *Terry* stop and investigation provided them with probable cause to believe the crime of criminal trespass was being committed in their presence, this would justify the arrest and search of the appellant.

The right of police officers contemporaneously to search, without a search warrant, the person of one lawfully

arrested applies to arrest for misdemeanors committed in the presence of the officer. The justification for such a search is to uncover fruits of the crime involved, to thwart destruction of evidence, and/or to discover and seize instruments which might aid in the person's escape. *State v. Henneke,* 78 Wn.2d 147, 149, 470 P.2d 176 (1970); *State v. Greene,* 75 Wn.2d 519, 521, 451 P.2d 926 (1969). Furthermore, evidence seized incident to a lawful arrest procedure may be used to prosecute for a crime other than the one for which the arrest was being made. *Greene,* at 521. In *Greene,* the officer's original reason for arresting the defendant was disturbance of the peace. The officer discovered narcotics on the defendant's person during the arrest and the defendant was convicted of violating the Uniform Narcotic Drug Act. In this case Glover was prosecuted for possession of cocaine after he was seized for criminal trespass.

The search of Glover's closed hand preceded Glover's formal arrest for the possession of cocaine, but was still a lawful search incident to arrest. A warrantless search can take place even *before* formal arrest as long as the police had probable cause for an arrest independent of what was uncovered in the search. As long as probable cause to arrest precedes the search, formal arrest is not required beforehand to justify the warrantless search incident to arrest. *Rawlings v. Kentucky,* 448 U.S. 98, 110–11, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980).

BRACHTENBACH and ANDERSEN, JJ., concur with GUY, J.

UTTER, J. (dissenting)—For the reasons expressed in my dissent in *State v. Little,* 116 Wn.2d 488, 806 P.2d 749 (1991), I also dissent in this case. However, I will address some concerns specific to this case that were not present in *Little.*

The majority sets out the standard for a *Terry* stop at page 513. In so doing, however, the majority omits one crucial part of the *Terry* analysis. In order to justify a stop

with less than probable cause, the officer "must be able to point to specific and articulable facts that give rise to a *reasonable suspicion that there is criminal activity afoot.*" (Italics mine.) *State v. White,* 97 Wn.2d 92, 105, 640 P.2d 1061 (1982). It is the absence of any reasonable suspicion that Glover was involved in criminal activity that invalidates his stop. When the police stopped Glover, all they knew was that they did not recognize him. The police did not know for sure that Glover was not a resident, or the guest of a resident. There were no articulable facts that led to a reasonable conclusion that Glover was engaged in criminal activity. Therefore, the stop was invalid.

What the majority and the trial court fail to realize is that the initial stop of Glover must be reasonable for his conviction to stand. The trial court cited several factors as supporting its decision that the officers had a reasonable suspicion sufficient to justify the stop. Those factors are: (1) the officers did not recognize Glover, (2) Glover twisted his cap while walking away from the officers, (3) Glover had a plastic bag in his hand, (4) the officers did not believe Glover when he said he lived in the complex, and (5) Glover denied having anything in his hand when the officers could clearly see he was holding something. Report of Proceedings, at 34–35. Factors 3, 4, and 5, however, occurred *after* the police had already stopped Glover. Therefore, those factors cannot be used to justify the stop since they could not have been considered by the officers in making the initial stop. The totality of the circumstances that the officers could have legitimately considered in stopping Glover were that (1) they did not recognize Glover, and (2) Glover acted nervous as he walked away from the officers. Those factors do not justify the stop.

The majority relies heavily on the existence of an agreement between the apartment managers and the Seattle police for officers to stop anyone who is on the apartment grounds and whom the officers do not recognize as a resident. The majority implies that the agreement itself is a

factor justifying the stop. As I explained more fully in the companion case, *State v. Little,* 116 Wn.2d 488, 502, 806 P.2d 749 (1991), a private agreement between two parties cannot grant the police power that the constitution denies them. Officers still need a reasonable and articulable suspicion that a person is engaged in criminal activity in order to make a *Terry* stop. The criminal trespass agreement simply does not provide any reasonable basis for believing that a particular individual is committing a crime.

The behavior of the police in this instance is even more egregious than that condoned by the majority in *Little.* Glover came out of a building in the apartment complex heading in one direction. He then changed his mind and headed in another. The police assert that he changed direction when he saw the officers. This is the officers' subjective impression. There is no objective evidence that Glover changed direction solely because he saw the officers. Even if he did, that in itself is not a suspicious circumstance. *See State v. Larson,* 93 Wn.2d 638, 645, 611 P.2d 771 (1980) (leaving upon arrival of police does not give rise to reasonable suspicion); *State v. Thompson,* 93 Wn.2d 838, 842, 613 P.2d 525 (1980) (rapid walking away from officers nothing more than inarticulable hunch and constitutionally insufficient to support detention). As one court noted:

> It is only when a person's effort to avoid police contact is coupled with an officer's specific knowledge connecting that person to some other action or circumstance indicative of criminal conduct that the evasive action . . . takes on a sufficiently suspicious character to justify a stop.

*People v. Thomas,* 660 P.2d 1272, 1275–76 (Colo. 1983).

The officers' sole purpose for stopping Glover was to see if he was committing criminal trespass. Glover Fact–Finding Hearing, at 5, 15. A person is guilty of criminal trespass if he "knowingly enters or remains unlawfully in or upon premises of another." RCW 9A.52.080(1). A person enters or remains unlawfully in or upon the premises of another if he is not then "licensed, invited, or otherwise privileged" to be there. RCW 9A.52.010(3). None of the circumstances

existing at the time the officers stopped Glover justify a reasonable suspicion that he was trespassing.

The officers testified they did not recognize Glover as one of the hundreds of residents of the Lakeshore Village Apartments. However, there was no finding of fact made that the officers knew all of the residents by sight. The fact that the officers did not recognize Glover can hardly be the basis for a *reasonable* suspicion that he was committing trespass. He could have been a new resident, or he could have been the guest of a resident. Even if he were a stranger to the area, that fact by itself cannot be the basis for a *Terry* stop. *Brown v. Texas*, 443 U.S. 47, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); 3 W. LaFave, *Search and Seizure* § 9.3(c), at 453 (2d ed. 1987).

The officers also claimed Glover appeared nervous and twisted his cap on his head. Nervous behavior in the presence of police is an almost universal response, and cannot, by itself, justify a *Terry* stop. *See* 1 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 13.4(b)(1), at 13–32 (1990) and cases cited therein.

The officers approached Glover and ordered him to stop. He obeyed the order and made no attempt to flee. At that moment he was seized for purposes of the Fourth Amendment and article 1, section 7. Nothing that happened after that point can be used to justify the initial stop.

When asked if he was a resident of the complex, Glover replied he was. That should have ended the interview but, based on a subjective determination, the officers did not believe him. Whether Glover was a resident was never established. An officer noticed a piece of plastic protruding from Glover's fist. He asked Glover what was in his hand and Glover replied, "Nothing." The officers demanded that Glover open his hand. Glover did so. His hand contained a plastic bag of what the officers believed to be cocaine. The bag did indeed contain the drug and Glover was charged with possession of cocaine.

The circumstances which the majority claims to support a *Terry* stop are that Glover walked away when he saw the

officers, the officers did not recognize Glover, Glover played with his cap and there was a trespass agreement between the police and the apartment management. These circumstances do not amount to a reasonable suspicion that Glover was engaged in criminal activity. The officers testified that Glover began to act suspiciously. No objective, specific facts support this. The "suspicious" circumstances are consistent with entirely innocent behavior.

Since the initial detention violated the Fourth Amendment and article 1, section 7, the search which revealed the cocaine was unreasonable and unlawful. The cocaine should have been suppressed as "fruit of the poisonous tree". *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

Even if the stop was lawful, a search is allowed only where a police officer has reasonable grounds to believe that a suspect is armed and dangerous. *Terry,* 392 U.S. at 30. The search is limited to a patdown of the individual's outer clothing to determine if the individual possesses a weapon. The sight of the plastic protruding from Glover's hand cannot reasonably be perceived as a weapon. The officers' search of Glover went beyond the scope of a legitimate *Terry* stop.

The stop of Glover was not justified by an articulable suspicion based on specific, objective facts that the particular individual was engaged in criminal activity at the time he was observed by the officers. The public has a strong interest in crime prevention, however, "[i]n the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." *Brown,* 443 U.S. at 52.

> There is an understandable desire by police officers to investigate what appear to be suspicious circumstances. Those investigations, however, must comport with Fourth Amendment protections. Otherwise, when a stop is not based on specifically articulated facts, "the risk of arbitrary and abusive police practices exceeds tolerable limits." *Brown,* at 52.

*State v. Thompson,* 93 Wn.2d 838, 843, 613 P.2d 525 (1980). This stop was illegal, and therefore the evidence should be suppressed and the conviction reversed.

SMITH, J., concurs with UTTER, J.

Reconsideration denied October 2, 1991.